# 2008 DTA 2

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE SAN JUAN-HUMACAO
PANEL VI**

INÉS P. HERNÁNDEZ PIZARRO
Recurrente

v.

ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO DE
LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA
Recurrida

Núm. KLRA-2007-00911

San Juan, Puerto Rico, a 16 de noviembre de 2007

Panel integrado por su Presidente, el Juez Brau Ramírez,
y los Jueces López Feliciano y Cortés Trigo

Cortés Trigo, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante nos la Sra. Inés P. Hernández Pizarro (recurrente) mediante el recurso de revisión de epígrafe. Nos solicita que revoquemos la Resolución emitida por la Junta de Síndicos de la Administración de los Sistemas de Retiro de los Empleados de Gobierno y la Judicatura (Junta) el 23 de mayo de 2007, archivada en autos y notificada el 20 de julio de 2007 (Resolución). Por medio de la Resolución, la Junta confirmó la decisión de la Administración de los Sistemas de Retiro de los Empleados de Gobierno y la Judicatura (Administración) de denegar la solicitud de la recurrente para que se le concedieran los beneficios de una pensión por incapacidad ocupacional y no ocupacional. Confirmamos la Resolución recurrida.

### I

La Sra. Hernández, de 54 años de edad, trabajó como secretaria del Municipio de San Juan. Tiene cotizado para el Sistema de Retiro de los Empleados de Gobierno 23.50 años. Según surge del expediente, la recurrente sufrió dos accidentes que reportó a la Corporación del Fondo del Seguro del Estado (CFSE). La primera ocasión fue el 19 de marzo de 1990. En aquel momento, la CFSE le diagnosticó un esguince lumbosacral. La segunda ocasión que la Sra. Hernández se reportó a la CFSE fue el 2 de junio de 1997. En este caso, la CFSE le diagnóstico esguince cervical y en las manos, síndrome de salida torácica (TOS), osteoartritis cervical, dolor de cabeza y cefalea post traumática.

El 7 de enero de 2004, la Sra. Hernández presentó una solicitud de pensión por incapacidad ocupacional y no ocupacional ante la Administración al amparo de la Ley Núm. 447 de 15 de mayo de 1951, según enmendada (Ley 447), 3 L.P.R.A. secs. 761 y ss. Su solicitud incluyó las condiciones relacionadas por la CFSE y las condiciones no relacionadas de espasmo cervical, neuropatía periferal, hipertensión y una condición mental de desorden esquizoafectivo.

El 20 de abril de 2005, la Administración le denegó la solicitud de pensión al determinar que la recurrente se encontraba capacitada para desempeñar sus labores en el servicio público. Inconforme con esta determinación, la recurrente presentó apelación ante la Junta el 12 de mayo de 2005.

La Junta, luego de celebrar vista, emitió la Resolución confirmando la decisión de la Administración de negar la concesión de los beneficios de pensión solicitados. En la Resolución, la Junta expuso el historial de evaluaciones de la recurrente, que incluia:

*"a. Expediente de la Corporación del Fondo del Seguro del Estado.*

*b. Examen Radiológico, consistente en una radiografía de la espina cervical, hombro derecho e izquierdo, realizado por el doctor Alvarado, el 20 de marzo de 1990. El resultado de la misma es negativo.*

*c. Examen Radiológico, consistente en una radiografía de la espina dorsal, lumbar y sacral, realizada por el Dr. Luis Ramos, el 3 de abril de 1990. En la misma, se indica que está negativo.*

*d. Evaluación Neurológica, realizada por el Dr. Enrique Jacobo Doger, el 15 de junio de 1990. En la misma, se indica que el cuello, hombros, miembros superiores y tórax, el movimiento es normal, sin dolor en la palpitación costal, intercostal ni interescapular. En el tronco hay restricción a la flexión y lateralidad, molestias*

*en la palpitación sacro coxis y atrofia muscular en los miembros inferiores, movilidad de rodillas, tobillos, y pies es normal. Se le diagnosticó "sprain" cervical y coxigodinea".*

*e. Examen Radiológico, consistente en una radiografía de la columna cervical y las manos, realizada por el doctor Rodríguez Pérez, el 3 de junio de 1997. Cervical: enderezamiento de la columna cervical. No hay evidencia de fractura ni de dislocación. Espacios intervertebrales bien conservados. Manos: No se identifica fractura, dislocación ni tejido blando.*

*f. Examen Radiológico, consistente en un MRI de la espina cervical realizado por el Dr. José Lázaga, el 8 de febrero de 2001. "Impresión: Normal MRI of the cervical spine".*

*g. Evaluación Médica preparada por la Dra. Elsie Cruz Cuevas, el 21 de mayo de 2003. En la misma, se indica que ha sido operada en dos ocasiones por un quiste en los ovarios y dos cesáreas. Se describe alerta, activa, orientada en las tres esferas, sin problemas respiratorios, con malestar en el área del cuello al moverlo, en las extremidades sin edema, sin cianosis, con fuerza muscular de 5/5, agarre de las manos está disminuido y con problemas al coger cosas del piso. Se le diagnosticó espasmo en el área del cuello, hipertensión, síndrome de salida torácica y asma bronquial.*

*h. Examen Cardiovascular preparado por la Dra. Elsie Cruz Cuevas, el 23 de julio de 2004. En el mismo, se indica que la visita desde diciembre de 2002, cada dos a tres meses. Se le encuentra la presión arterial en 120/80 el 23 de julio de 2004. Se indica que no tiene órganos afectados y el sistema respiratorio está normal, sin paro respiratorio congénito, pulsos periferales presente y en las extremidades es normal, no surge que se le haya realizado exámenes cardiovasculares. Se le diagnosticó hipertensión y una prognosis reservada.*

*i. Evaluación Mental, realizada por el Dr. Luis Rojas, el 22 de febrero de 2004. En la evaluación se indica que lo visita desde agosto de 2003 y las visitas son cada dos meses. Se describe a una mujer cooperadora, sin maquillaje, lógica, coherente, relevante, actividad psicomotora disminuida, sin ideas suicidas u homicidas, orientada en las tres esferas, con ansiedad, preocupación, memoria disminuida, juicio superficial, introspección disminuida, atención y concentración disminuida, no participa de actividades de grupos, requiere de ayuda en tareas del hogar, se mantiene aislada. Se le diagnóstico desorden de esquizoafectivo y entiende que no puede administrar sus bienes.*

*j. Evaluación Mental, realizada por el Dr. Luis Rojas, en agosto de 2004. En la misma, se indica que lo visita cada dos a tres meses. Se describe a una mujer cooperadora, sin maquillaje, actividad psicomotora disminuida, sin ideas suicidas u homicidas, lógica, relevante, coherente, orientada en las tres esferas, llorosa, ansiosa, memoria disminuida, juicio pobre, introspección pobre, atención y concentración pobres, contacto social pobre, no participa de actividades y entiende que no puede manejar sus fondos. Se le diagnosticó desorden esquizoafectivo, depresión con problemas de memoria.*

*k. Evaluación Neurológica, suscrita por el Dr. William Matos, el 3 de marzo de 2005. Se describe a una mujer bien desarrollada, obesa, sin problemas respiratorios, alerta, bien orientada y deprimida. Añade que en el cuello el movimiento es normal, en las extremidades no hay edema, cianosis, úlceras, atrofia, venas varicosas y los pulsos periferales están normales, fuerza muscular de 5/5, sin dificultad para acostarse de la mesa de examen, sin dificultad para sentarse, caminar, halar, empujar o agarrar. Fue positivo del examen del tinnel. Se le diagnóstico hipertensión, síndrome del túnel carpo bilateral y una condición emocional.*

*l. Revisión Médica del Expediente realizada por el Dr. Vicente Sánchez Quiles, el 7 de abril de 2005. En el análisis, se indica que no cumple con los criterios de severidad de los listados 1.05, 1.12, 1.13, 4.03 ni 10.14, para una pensión por incapacidad.*

*m. Revisión Médica del Expediente, realizada por el Dr. Alfredo Hurtado de Mendoza, el 11 de abril de 2005. En los comentarios indica que la evidencia examinada no documenta los requisitos de severidad necesarios contemplados en el listado 11.04 para una pensión por incapacidad."*

La Junta consideró toda la prueba médica para llegar a la determinación de que la recurrente estaba capacitada para laborar en el servicio público. Concluyó que las condiciones que la aquejan no constituyen impedimento alguno, tomadas en forma aislada y en conjunto, que cumplan con el criterio de severidad del listado de incapacidades para que un beneficiario pueda ser elegible para una pensión por incapacidad ocupacional o no ocupacional.

Inconforme con la Resolución, la recurrente presentó moción de reconsideración ante la Junta el 7 de agosto de 2007, la cual no fue acogida por dicho organismo. Presentó entonces el recurso de revisión judicial de epígrafe. Señala como único error que:

*"Cometió Error de Derecho la Junta de Síndicos de la Administración de los Sistemas de Retiro al resolver que la aquí parte recurrente no tiene derecho a la pensión por incapacidad ocupacional y no ocupacional solicitada, concluyendo incorrectamente que ésta no presentó prueba suficiente para demostrar que cumple o iguala los requisitos de severidad de al menos uno de los listados o llamados "Listings" de incapacidad aplicables, a pesar de que sí existe evidencia sustancial obrante en el expediente administrativo que sostiene afirmativamente dicha incapacidad y al adjudicar de manera separada y aislada cada uno de dichos "Listings" omitiendo su deber de evaluar si el conjunto de las condiciones que padece cumple o iguala la severidad requerida por los susodichos "Listings"."*

El Procurador General compareció el 18 de octubre de 2007 mediante Escrito en Cumplimiento de Orden. Alega que la recurrente no logró establecer que estaba total y permanentemente incapacitada para realizar cualquier tipo de trabajo que le produzca un ingreso estable. Resolvemos.

## II

La facultad revisora de los tribunales de las decisiones emitidas por una agencia administrativas incluye las siguientes áreas: (1) concesión del remedio apropiado; (2) revisión de las determinaciones de hechos conforme al criterio de evidencia sustancial; y (3) revisión de las conclusiones de derecho en su totalidad. *T-JAC, Inc. v. Caguas Centrum Limited*, 148 D.P.R. 70, 80-81 (1999); *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64, 129 (1998); D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 2da. Ed., Bogotá, Forum, 2001, pág. 534.

La función revisora del tribunal, aunque restringida, tiene como propósito fundamental delimitar la discreción de los organismos administrativos y velar porque sus actuaciones sean conformes a la ley y estén dentro del marco del poder delegado. *Misión Ind. P.R. v. J.P.*, 146 D.P.R., a la pág. 129.

Este ejercicio por parte del tribunal está enmarcado en dos principios fundamentales que postula la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como Ley de Procedimiento Administrativo Uniforme (LPAU), 3 L.P.R.A. sec. 2101 y ss. *"Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo."* 3 L.P.R.A. sec. 2175. Sin embargo, *"[l]as conclusiones de derecho serán revisadas en todos sus aspectos por el tribunal."* *Id.* Es, por tanto, indispensable que la agencia realice determinaciones de hechos y conclusiones de derecho que puedan proporcionar a los tribunales la base en la que descansó la decisión del organismo administrativo. De esta forma, los tribunales estarán en posición de descargar su función revisora responsablemente.

El criterio rector en la revisión judicial de una determinación de hechos de una agencia es la existencia de

evidencia sustancial. A estos fines, se ha definido evidencia sustancial como *"aquella [evidencia] pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión."* Ramírez v. Depto. de Salud, 147 D.P.R. 901, 905 (1999). De ordinario, los tribunales no intervendrán en las determinaciones de hechos de las agencias, mientras exista evidencia sustancial en apoyo de las mismas. *Pacheco v. Estancias,* 160 D.P.R. 409, 432 (2003). Dicho análisis requiere que la evidencia sea considerada en su totalidad; esto es, tanto la que sostenga la decisión administrativa como la que menoscabe el peso que la agencia le haya conferido. *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.,* 144 D.P.R. 425, 437 (1997). Esta norma persigue evitar que los tribunales sustituyan el criterio de la agencia en asuntos enmarcados en su destreza y especialización por el criterio del tribunal revisor.

Para sostener la posición de que no existe evidencia sustancial que apoye las determinaciones de la agencia administrativa, la parte afectada debe demostrar que existe *"otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la totalidad de la prueba presentada... y hasta el punto que se demuestre claramente que la decisión [de la agencia] ... no está justificada por una evaluación justa del peso de la prueba."* Hilton Hotels v. Junta Salario Mínimo, 74 D.P.R. 670, 686 (1953). La prueba ofrecida deberá desfavorecer la presunción de que la determinación del organismo administrativo se desprende de la totalidad de la prueba que éste tuvo ante su consideración. Véase, *Ramírez v. Depto. de Salud,* 147 D.P.R., a las págs. 905-906.

Respecto a las determinaciones de derecho de la agencia, el tribunal podrá revisarlas en todos sus aspectos, aunque observando un nivel de deferencia por el criterio de la agencia en aquella legislación que ésta implante. Véase, *Rebollo Vda. de Liceaga v. Yiyi Motors,* 161 D.P.R.____ (2004), **2004 J.T.S 4**, a la pág. 501; *P.R.T.C. v. J. Reg. Tel. de P.R.,* 151 D.P.R. 269, 282 (2000). Esta norma no presupone que el tribunal revisor pueda descartar libremente las interpretaciones o conclusiones de la agencia administrativa, sino que les dará deferencia en la medida que éstas sean razonables. *Misión Ind. P.R. v. J.P.,* 146 D.P.R., a la pág. 132. Por tanto, el tribunal revisor sostendrá las conclusiones de la agencia mientras las mismas sean cónsonas con el propósito legislativo y no sean arbitrarias, ilegales o irrazonables. *Id.; T-JAC, Inc. v. Caguas Centrum Limited,* 148 D.P.R., a la pág. 80.

En aquellos asuntos que puedan ser catalogados como cuestiones mixtas de hechos y de derecho, la norma establecida es que la revisión judicial será análoga a la revisión de asuntos de derecho. Estos asuntos mixtos de hechos y de derecho surgen ordinariamente en ocasiones en las cuales existe confusión en cuanto a la aplicación del derecho a los hechos particulares del caso. *Fernández Quiñones, op. cit.,* pág. 561.

Por otro lado, la Ley 447 establece un sistema de retiro y beneficios para los empleados del Gobierno elegibles que aporten a estos programas. *Pérez et als. v. Depto. de la Familia,* 156 D.P.R. 223, 230 (2002). Entre otros beneficios, el Artículo 2-109 de la Ley 447, según enmendado, 3 L.P.R.A. sec. 770, reconoce el derecho a una anualidad por incapacidad no ocupacional a *"[t]odo participante que, teniendo por lo menos 10 años de servicios acreditados, se inhabilitare para el servicio, debido a un estado mental o físico y que por razón de ese estado estuviere incapacitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado."*

Por su parte, el Artículo 2-107 de la Ley 447, según enmendado, 3 L.P.R.A. sec. 769, dispone, en lo pertinente, lo siguiente:

*"Todo participante que, como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional, siempre que:*

*(a) Se recibiere suficiente prueba médica en cuanto a la incapacidad mental o física del participante conforme a los criterios que mediante reglamento fije el Administrador.*

*(b) El participante o el patrono, de acuerdo con los reglamentos de la Junta, notifique al Administrador con respecto a dicha incapacidad.*

*(c) El Fondo del Seguro del Estado determine que el accidente o enfermedad provino de cualquier función del trabajo o sea inherentemente relacionado al trabajo o empleo."*

Además, el Artículo 2-111 de la Ley 447, según enmendado, 3 L.P.R.A. sec. 771, establece, en lo pertinente, que:

*"Para los fines de una anualidad por incapacidad ocupacional o no ocupacional, se considerará incapacitado a un participante cuando la incapacidad esté sustentada con suficiente prueba médica conforme a los criterios que mediante reglamento fije el Administrador y dicha prueba revele que el participante está imposibilitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado."*

Estos criterios médicos se incorporaron en el Reglamento para la Concesión de Pensiones por Incapacidad a los(as) Participantes de los Sistemas de Retiro de los(as) Empleados(as) del Gobierno y la Judicatura, Reglamento Núm. 6719 de 5 de noviembre de 2003 (Reglamento). En la Sección 6.1 (J) del Reglamento se establece lo siguiente:

*"Para los fines de una anualidad por incapacidad, se considerará incapacitado(a) a un(a) participante cuando la incapacidad esté sustentada con suficiente prueba médica, conforme a los Criterios adoptados por el (la) Administrador(a), y dicha prueba revele que el(la) participante está inhabilitado(a) para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado."*

Por su parte, la Sección 6.2 del Reglamento establece como requisitos para solicitar una pensión por incapacidad ocupacional lo siguiente:

*"A. Todo(a) participante que, como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado(a) para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional. Para tener derecho a una pensión por incapacidad ocupacional bajo este Artículo, será requisito que el participante:*

*1) Sea participante activo(a) a la fecha en que ocurre el accidente por el cual solicita una anualidad por incapacidad ocupacional;*

*2) La Corporación del Fondo del Seguro del Estado (CFSE) determine que el accidente o enfermedad provino de cualquier función del trabajo o que sea inherentemente relacionado al trabajo o empleo, a tenor con lo dispuesto por la Ley del Sistema de Compensaciones por Accidentes del Trabajo, Ley 45 del 18 de abril de 1935, según enmendada;*

*3) Radique su solicitud dentro de los ciento ochenta (180) días en que la CFSE emita dicha determinación;*

*4) Se reciba la Certificación de Compensabilidad para la Administración, (modelo CFSE 0037, Abr. 2002) que emitirá la Corporación del Fondo del Seguro del Estado, sobre el accidente por el cual solicita la incapacidad ocupacional;*

*5) Se reciba suficiente evidencia médica;*

*6) Cumpla con la Sección 6.1 de este Reglamento.*

*B. El(la) Administrador(a) podrá solicitar a la Corporación del Fondo del Seguro del Estado los informes médicos de exámenes practicados al(la) empleado(a) y cualquier otro documento relacionado con el accidente del trabajo que motive la reclamación. El(la) Administrador(a) de la Corporación del Fondo del Seguro del Estado pondrá a su disposición dichos informes.*

*C. El importe de la anualidad será igual al cincuenta por ciento (50%) del último tipo de salario que hubiese tenido derecho a percibir el(la) participante estando en servicio activo. Para todo(a) nuevo(a) participante, el importe será igual al cuarenta por ciento (40%) del último tipo de salario que hubiese tenido derecho a percibir estando en servicio activo."*

En cuanto a la concesión de pensión por incapacidad no ocupacional, la Sección 6.3 del Reglamento establece los siguientes requisitos para ser acreedor a la misma:

*"A. Todo(a) participante que se inhabilitare para el servicio, debido a un estado mental o físico y que por razón de ese estado estuviere incapacitado(a) para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado, tendrá derecho a una anualidad por incapacidad no ocupacional. Para tener derecho a una pensión por incapacidad no ocupacional bajo este Artículo, será requisito que el participante:*

*1) Se encuentre en servicio activo a la fecha de radicación de la solicitud;*

*2) Tenga por lo menos diez (10) años de servicios acreditados;*

*3) Cumpla con la Sección 6.1 de este Reglamento.*

*B) El importe de la anualidad será el uno y medio por ciento (1½%) de la retribución promedio, multiplicado por el número de años de servicios acreditados hasta veinte (20) años, más el dos por ciento (2%) de la retribución promedio multiplicado por el número de años de servicio acreditados en exceso de veinte (20) años."*

Por su parte, el Artículo 5. (6) del Reglamento define *"incapacidad"* como *"la inhabilidad e imposibilidad del(de la) participante para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado, conforme a los Criterios médicos establecidos por el(la) Administrador(a) en el Manual para la Evaluación de Incapacidad de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura."* Además, establece que la *"incapacidad total y permanente"* es *"cuando la condición médica del(de la) participante es de tal naturaleza, que no se espera recuperación alguna, conforme a los Criterios médicos establecidos por el(la) Administrador(a) en el Manual para la Evaluación de Incapacidad de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura."* Artículo 5. (7) del Reglamento.

El Manual para la Evaluación de Incapacidad de la Administración de los Sistemas de Retiro de los Empleados de Gobierno y la Judicatura (Manual) es un apéndice del Reglamento. El Manual *"contiene los códigos médicos con el grado de severidad y hallazgos médicos requeridos para determinar si existen las condiciones físicas y/o mentales que, por su naturaleza, resultan incapacitantes. El Manual provee, además, las normas aplicadas durante el proceso de evaluación de determinaciones de incapacidad."* Manual, APLICABILIDAD Y PROPÓSITO.

En la parte de INFORMACIÓN GENERAL del Manual se establece que:

*"A. Definición de Incapacidad para la Administración de los Sistemas de Retiro:*

*Se considerará incapacitado a un participante, cuando la incapacidad esté sustentada con suficiente prueba médica, conforme a los criterios aquí establecidos, que revele que el participante está imposibilitado para*

*cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado. Dicha imposibilidad deberá durar un período no menor de doce (12) meses.*

*Se considerará una incapacidad como total y permanente, cuando las condiciones que lo incapacitan sean de tal naturaleza, que no se espere recuperación alguna.*

*B. Definición de Incapacidad médicamente determinable:*

*Una incapacidad médicamente determinable es aquella que resulta de alteraciones anatómicas, fisiológicas o sicológicas que puedan ser demostradas por la clínica, estudios y pruebas de laboratorio médicamente aceptables. La evidencia médica debe incluir signos, síntomas y hallazgos de estudios y laboratorios que permitan al Médico Asesor analizar y establecer, de forma fiel y objetiva, el grado de limitación correspondiente.*

*El diagnóstico, las alegaciones y quejas de síntomas del reclamante, no se consideran como incapacitantes por sí solas.*

*C. Evidencia médica aceptable:*

*Se considera evidencia médica aceptable, toda aquella presentada por las fuentes de tratamiento del reclamante, ya sea copia de expedientes médicos, de hospitalizaciones o cuestionarios provistos por la Administración, además de todo estudio, resultado de laboratorio o examen mental concerniente a los diagnósticos, alegaciones y quejas del reclamante.*

**Las opiniones o decisiones de incapacidad emitidas por otras fuentes, no obligan a la Administración a otorgar una incapacidad.**

*D. Proceso de evaluación:*

*1. Se evaluará la evidencia, según los criterios establecidos en los Códigos Médicos, si:*

*a. llena los requisitos de los mismos; o*

*b. si iguala los requisitos. Se entiende por igualar, si:*

*1. la condición médica tiene el mismo nivel de severidad que se establece en el código, pero se llegó a la misma por pruebas o exámenes médicos equivalentes y no necesariamente a través de los requisitos específicos que exigen el mismo; o*

*2. si una condición médica no está contemplada en ninguno de los códigos, pero la severidad es similar o comparable a uno ya establecido; o*

*3. que un impedimento contemplado en un código no esté presente y pueda ser sustituido por otro equivalente y de igual severidad; o*

*c. por combinación de impedimentos;*

*1. Cuando las condiciones médicas documentadas, por sí solas, no llenan ni igualan un código en particular, pero al considerarse en conjunto alcanza un grado de severidad incapacitante.*

*La combinación será por el conjunto de las condiciones físicas, por el conjunto de las condiciones mentales o por*

*combinación de ambas.*

*2. Si cumple con los requisitos administrativos de la Ley 447 de 15 de mayo de 1951, según enmendada:*

*a) Se considerará la posibilidad de combinación del Fondo del Seguro del Estado. Si no cualifica, entonces,*

*b) Se considerará la posibilidad de combinación de condiciones no relacionadas.*

*c) En el caso de que la combinación de condiciones relacionadas por la Corporación del Fondo del Seguro del Estado y las no relacionadas, resulten incapacitantes, se adjudicará como Incapacidad no Ocupacional.*

*2. Si se determina que el participante, está incapacitado, se otorgará el beneficio como total o permanente, si no se espera recuperación médica alguna. De no ser así, se otorgará el beneficio con exámenes médicos periódicos."*

Además, en la parte de CÓDIGOS MÉDICOS del Manual se dispone que:

*"La evaluación médica se basará en trece (13) códigos, descritos a continuación. Cada uno incluye una introducción general que contiene la definición de los conceptos claves que se usan en los mismos. También, se incluye en esta introducción, determinados hallazgos médicos específicos; algunos de los cuales son necesarios para establecer un diagnóstico o confirmar la presencia de una condición incapacitante. Si los hallazgos necesarios para sustentar una condición médica, no se encuentran en la introducción, o en cualquier otra parte del código, aún así, ésta tiene que establecerse mediante pruebas diagnósticas clínicas de estudios y laboratorios médicamente aceptables.*

*Seguido a·la introducción, cada código contendrá el grado de severidad y hallazgos médicos requeridos para llenar el mismo. De no llenar la severidad requerida por el código, se podrá considerar la incapacidad por el concepto de igualar o el de combinación de impedimentos, según se establece en la sección de normas y procedimientos de este Manual."*

Los códigos están divididos en la siguiente forma:

1.0 Sistema Musculoesqueletal
2.0 Sentidos Especiales y Habla
3.0 Sistema Respiratorio
4.0 Sistema Cardiovascular
5.0 Sistema Gastrointestinal
6.0 Sistema Genitourinario
7.0 Sistema Hemático y Linfático
8.0 Piel
9.0 Sistema Endocrino y Obesidad
10.0 Sistema Neurológico
11.0 Trastornos Mentales
12.0 Enfermedades Neoplásticas
12.0 Sistema Inmunológico

El Tribunal Supremo ha establecido que, conforme este esquema, una incapacidad leve que limita las funciones de un empleado, pero no le impide llevar a cabo las funciones de su trabajo o de cualquier otro empleo remunerativo, no da base para recibir una pensión bajo la Ley 447. La incapacidad debe ser de tal naturaleza que le inhabilite para desempeñar las tareas que realizaba en su puesto o las de otro empleo remunerativo comparable.

*Padín v. Retiro* 172 D.P.R.__ (2007), **2007 J.T.S. 151**; *Sánchez v. A.S.R.E.G.J.*, 116 D.P.R. 372, 376 (1985).

## III

En la situación de autos, la Junta concluyó que la prueba médica en el récord demostró que la recurrente no estaba incapacitada para llevar a cabo las funciones de su empleo o de cualquier otro empleo comparable en el gobierno. En su recurso, la recurrente plantea que la Junta erró al concluir que no estaba incapacitada. Alega, en síntesis, que hay evidencia sustancial en el expediente administrativo para demostrar que cumple o iguala los requisitos de severidad de al menos uno de los listados de incapacidad aplicables y el conjunto de las condiciones que padece cumple o iguala la severidad requerida por dichos listados. De las varias condiciones que padece, la recurrente se limitó a discutir específicamente que cumplía con los requisitos de severidad en la condición mental y la de la región cervical, por lo que nos limitaremos a discutir éstas.

En primer lugar, la Junta utilizó el siguiente criterio médico para evaluar la condición mental de la recurrente:

*"11.04 Trastornos afectivos*

*Están caracterizados por un disturbio en el estado del ánimo que se compara por un síndrome maníaco o depresivo, total o parcial. Ánimo (mood) se refiere a una emoción prolongada que matiza toda la vida psíquica y que envuelve, usualmente, un estado de depresión o de euforia.*

*El nivel de severidad requerido para estos trastornos se alcanza cuando los requisitos en A y B son satisfechos o cuando se satisfacen los requisitos en C.*

*A. Persistencia médicamente documentada, tanto de forma continua como episódica, de uno de los siguientes:*

*1. Síndrome depresivo caracterizado al menos por cuatro de los siguientes:*

*a. Anhedonia o pérdida persistente del interés en casi todas las actividades; o*

*b. Disturbios del apetito con cambios en el peso; o*

*c. Disturbios en el sueño; o*

*d. Agitación o retardación psicomotora; o*

*e. Disminución de la energía; o*

*f. Sentimientos de culpa o de inutilidad; o*

*g. Dificultad en la concentración o en el pensamiento; o*

*h. Pensamientos suicidas; o*

*i. Alucinaciones, delirios o pensamiento paranoide; o*

*2. Síndrome maníaco caracterizado al menos por tres de los siguientes:*

*a. Hiperactividad; o*

*b. Habla apresurada; o*

*c. Fuga de ideas; o*

*d. Autoestima exagerada; o*

*e. Disminución de la necesidad de dormir; o*

*f Fácilmente distraído; o*

*g. Envolvimiento en actividades que tienen un alto potencial para producir consecuencias dolorosas que no son reconocidas como tal; o*

*h. Alucinaciones, delirios o pensamientos paranoide; o*

*3. Síndrome bipolar con un historial de períodos episódicos manifestados por el cuadro sintomático completo de ambos síndromes, depresivo y maníaco (actualmente caracterizados lo mismo el uno o por ambos síndromes); y*

*B. Resultando por lo menos en dos de los siguientes:*

*1. Restricciones marcadas en las actividades del diario vivir; o*

*2. Dificultades marcadas para mantener la concentración, persistencia o ritmo; o*

*3. Episodios repetidos de descompensación con duración prolongada; o*

*A. Historial médicamente documentado de un trastorno mental orgánico crónico, de por lo menos dos (2) años de duración, que haya causado más de una limitación mínima en la habilidad para realizar actividades laborales básicas y con síntomas y signos actualmente disminuidos mediante la medicación o el apoyo psicosocial, y uno de los siguientes:*

*1. Episodios repetidos de descompensación con duración prolongada; o*

*2. Residuales de la enfermedad que resulten en un ajuste marginal, de tal grado que se podría predecir que un aumento mínimo en las demandas mentales o cambios en el medio ambiente podrían ocasionar una descompensación en el individuo; o*

*3. Historial actual de un año o más de inhabilidad para funcionar fuera de un ambiente altamente protegido, y con una indicación de que necesita mantenerse en dicho ambiente continuamente."*

De este listado surge que la condición mental de la persona tiene que cumplir con los requisitos de los incisos A y B o del inciso C. En este caso, la Junta determinó que la condición mental de la recurrente no cumplió con los criterios de los listados 11.04 (A) (1), 11.04 (B) y 11.04 (C).

Conforme surge de la Resolución, la condición emocional de la recurrente se encuentra documentada por dos informes siquiátricos preparados por el Dr. Luis Rojas (Dr. Rojas) el 22 de febrero y 8 de agosto del 2004.

En cuanto al listado 11.04 (A), la Junta concluyó que no cumplía con seis de los criterios porque no es una persona que haya perdido el interés en las cosas, ni que tenga disturbios del apetito, sentimientos de culpa o inutilidad, ideas suicidas o alucinaciones. Aun cuando el Dr. Rojas indicó que tenía problemas con la memoria, durante la celebración de la vista administrativa, ésta indicó que su memoria se encontraba bastante bien. Además, la Junta determinó que requería medicamentos para dormir y tenía retardación psicomotora. No indicó si

la recurrente sufría de disminución de energía.

En su recurso, la recurrente apunta que cumple con cinco de los nueve criterios de este listado porque tiene anhedonia o pérdida el interés en casi todas las actividades, retardación psicomotora, disminución de la energía, disturbios en la concentración y pensamientos e ideas suicidas.

Hemos examinado los informes del Dr. Rojas y no surge que tenga ideas suicidas, ni que tenga disminución de la energía. Considerando esto y que en la vista administrativa indicó que su memoria estaba bastante bien, no podemos concluir que se cumpla con el mínimo de cuatro de los criterios requeridos por el listado 11.04 (A).

En cuanto al listado 11.04 (B), la Junta indicó que la recurrente tampoco cumplía porque no surgía que tuviera restricciones marcadas en el diario vivir, ya que ella manifestó durante la vista administrativa que conduce, va de compras, ve televisión, cocina y lee. Además, no surgía que tuviera dificultades marcadas en la concentración, ya que los médicos indicaron que, aun cuando la concentración estaba disminuida o pobre, no representaba una limitación marcada y la recurrente declaró que su memoria estaba bastante bien. Por último, la Junta concluyó que no padecía de períodos de descompensación por su testimonio en la vista.

La recurrente indica que la prueba siquiátrica demostró sus marcadas restricciones del diario vivir y para mantener la concentración, persistencia y ritmo. Sin embargo, no cuestiona las conclusiones de la Junta basadas en su propio testimonio que descartan que se cumplan estos criterios, por lo que tampoco cumple con los criterios de este listado.

Por otro lado, la Junta evaluó las condiciones musculoesqueletales de la recurrente a base varios listados, incluyendo el aquí pertinente -el listado 1.05 C.- que dispone lo siguiente:

*"1.05 Desórdenes de la Espina Vertebral*

*A.      [...]*

*C. Otros desórdenes vertebrogénicos (Ej. herniación del núcleo pulposo, estenosis espinal) con persistencia de los siguientes por lo menos durante tres meses, a pesar de estar bajo tratamiento, y que se espera duren por lo menos doce (12) meses consecutivos. Con ambos 1 y 2:*

*1. Dolor, espasmos muscular y limitación significativa del arco de movimiento de la columna; y*

*2. Pérdida motora, de fuerza muscular, sensorial y de reflejos significativas."*

La Junta encontró que la prueba médica presentada demostró que la condición no cumplía con los criterios de severidad requeridos en este listado médico.

En cuanto a las condiciones de la región cervical de la espina vertebral, las radiografías del 1990 del área cervical, hombro derecho e izquierdo y de la espina dorsal, lumbar y sacral, dieron resultado negativo. Según la evaluación neurológica del 1990, el movimiento de rodillas, tobillos y pies y del cuello, hombros, miembros superiores y tórax era normal, sin dolor a la palpación costal, intercostal ni interescapular y se le diagnosticó esguince cervical y coxigodínea.

Una radiografía del 1997 reveló que la recurrente tenía enderezamiento de la columna en el área cervical, sin fractura ni dislocación y con los espacios intervertebrales bien conservados. Un MRI del 2001 del área cervical dio resultado normal. La neuróloga Dra. Cruz le diagnosticó en el 2003 espasmo en el área del cuello. Y el Dr. William Matos, neurólogo, evaluó a la recurrente en el 2005 y no le diagnosticó condición alguna en la región

cervical.

La Junta concluyó que con la evidencia reseñada anteriormente, no era acreedora a la pensión solicitada porque la condición cervical que padece no llenaba los requisitos de severidad de los listados aquí citados.

En su recurso, la recurrente indica que según los peritos de la CFSE y la Comisión Industrial que la examinaron en una vista en el 2003 tenía dolor a la palpación con espasmo muscular severo en la región cervical y limitación en los movimientos, y el Dr. Sepúlveda le diagnosticó en el 2004 espasmo muscular cervical crónico. Sin embargo, no refuta que el MRI de la región del 2001 fue negativo y en la evaluación neurológica más reciente -del 2005-, no se le diagnosticó condición alguna en la región cervical. Tampoco expresa que prueba médica demuestra que se cumple con lo requerido en el listado 1.05 (C) (2) sobre pérdida motora, de fuerza muscular, sensorial y de reflejos significativas. Por lo tanto, no nos ha puesto en condiciones de sustituir la apreciación de la Junta sobre dicha prueba.

En resumen, en el caso ante nos, la parte recurrida aplicó correctamente el estándar establecido por la Ley Núm. 447, a saber: si las condiciones de la recurrente la incapacitan total y permanentemente para cumplir los deberes de cualquier cargo o empleo retribuido. En consecuencia, las conclusiones de la recurrida son cónsonas con el propósito de dicha legislación y no son arbitrarias, ilegales o irrazonables, por lo que debemos sostenerlas.

## IV

Por los fundamentos expuestos, se confirma la resolución emitida por la Junta de Síndicos de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura el 23 de mayo de 2007 y archivada en autos y notificada el 20 de julio de 2007.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.

Lcda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones